UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

RATNA PRABHAKAR,

                Plaintiff,

                                             **MEMORANDUM & ORDER**
           v.                                09-CV-05530 (PKC)

LIFE INSURANCE COMPANY OF NORTH
AMERICA,

                Defendant.

----------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

      On December 16, 2009, Plaintiff Ratna Prabhakar, acting *pro se*, filed her complaint alleging that Defendant Life Insurance Company of America ("LINA") had violated the terms of the Group Long Term Disability Income Policy (the "Policy") issued to State Farm Mutual Automobile Insurance Company ("State Farm").  (Dkt. No. 45 ("Joint Pre-Trial Order"), at 4.) The alleged violation occurred when LINA terminated Plaintiff's coverage under the Policy as a State Farm employee, and denied the payment of long term disability benefits to Plaintiff in December 2003.  (Dkt No. 1 ("Compl.") ¶¶ 6, 9, 15.)

      On June 6, 2013, at a pre-trial conference in this action, this Court ruled that, although the administrative record constituting Plaintiff's claim history under the Policy would comprise the core evidence at trial, the parties would also be permitted to introduce extra-record evidence relating to, *inter alia*, (i) whether Plaintiff's copy of the Policy contained the provision notifying her of the three-year limitations period for filing this action, and (ii) the offset applied against Plaintiff's long term disability benefits based on a lump sum workers' compensation award. (Dkt. No. 47.)

On July 22, 2013, this Court conducted a one-day bench trial in this action.  *See Sullivan v. LTV Aerospace & Defense Co.*, 82 F.3d 1251, 1258-59 (2d Cir. 1996) ("[T]here is no right to a jury trial in a suit brought to recover ERISA benefits.").  Plaintiff presented her own testimony and that of her son, Sunil Prabhakar, and introduced three documents into evidence (Plaintiff's Exhibits ("Pl. Exs.") A-C).  LINA presented the testimony of Richard Lodi, one of its Senior Operations Representatives, and, through Mr. Lodi, introduced the administrative record into evidence (Defendant's Exhibit ("Def. Ex.") 1).[1]

On July 29, 2013, this Court directed LINA to submit a sworn declaration, providing additional evidence relating to the three-year limitations period applicable to this action.  (Dkt. No. 53.)  LINA submitted a declaration from Mr. Lodi.  (Dkt. No. 54 ("Lodi Decl.").)

Based on the administrative record and other evidence received during and after trial, this Court finds that, even though this evidence demonstrates that LINA improperly denied Plaintiff's long term disability benefits in December 2003, she cannot recover such benefits, because this action is untimely.  The limitations period applicable to this action is three years.  The Policy contained a provision notifying State Farm employees of the three-year limitations period, and the evidence establishes that Plaintiff received at least one copy of the Policy containing this provision.  Accordingly, this Court must dismiss this action with prejudice as being time-barred.

This Court's decision is based on the findings of fact and conclusions of law set forth below.

*             *             *

---

[1]     Def. Ex. 1 is the 863-page administrative record maintained by LINA.  All references to the administrative record will be identified by the individual page numbers denoted as "LINA ___."

I.   Findings of Fact

From June 20, 1988 to September 17, 1990, Plaintiff was employed by State Farm as a secretary and senior mail records clerk.  (LINA 612, 731, 861; Tr. 49.)[2]  On December 12, 1989, while at work, Plaintiff tripped and fell, resulting in injuries to her head and leg.  (LINA 654, 862; *see* Joint Pre-Trial Order, at 4.)

A.   *LINA's Payment of Long Term Disability Benefits to Plaintiff*

1.   Plaintiff's Total Disability

As a State Farm employee, Plaintiff was covered by the Policy with LINA.[3]  (Pl. Ex. A; LINA 6-47.)  Within a week of the accident, Plaintiff began seeing a neurologist, Dr. Ira Casson, who diagnosed Plaintiff as suffering from post-concussion syndrome.  (LINA 646, 654, 731-32, 859.)  Dr. Casson also concluded that Plaintiff was totally disabled.  (LINA 646, 834, 859-60.)

In the summer of 1990, despite her continuing total disability, Plaintiff returned to work at State Farm.  (LINA 731, 802, 835-36.)  On September 17, 1990, however, Plaintiff stopped working.  (LINA 731, 858, 861.)  She started receiving long term disability benefits as of March 17, 1991.  (LINA 797-99.)

In September 1991, following a referral from Dr. Casson, Dr. Eugene Zanger, a psychologist, concluded, *inter alia*, that Plaintiff was suffering from an "organic mental

---

[2]      All references to the trial transcript will be denoted as "Tr. __."

[3]      LINA, being CIGNA's subsidiary, used "CIGNA" as its "service mark" when administering Plaintiff's claims for long term disability benefits.  (Compl., at 1; Tr. 57.) "CIGNA" often appeared on the forms and correspondence from LINA to Plaintiff and Plaintiff's physicians as part of the claims process.  (Tr. 57; *see, e.g.*, LINA 854, 862.) Accordingly, LINA and CIGNA are treated as interchangeable for the purposes of this decision. (*See* Tr. 57 ("Just to clarify . . . whenever [LINA's counsel] is referring to Cigna, she means Cigna/LINA, the same company.").)

syndrome"[4] and displaying symptoms of severe depression and anxiety.  (LINA 652, 656.)  Dr. Zanger also found that Plaintiff was "unable to function in almost any realm except the most routine behaviors."  (LINA 653.)

On July 25, 1993, Dr. Casson provided a "Comprehensive Medical Report" summarizing in detail his treatment of Plaintiff since December 1989.  The report concluded with Dr. Casson's findings that:

> This patient is suffering from a severe post-concussion syndrome with headaches, vestibular dysfunction and severe cognitive and memory impairment.  As a result of the severe post-concussion syndrome, she is also suffering from a [sic] severe anxiety and depression but this is clearly post-traumatic in origin.  The fact that she may have had some mild depression prior to this injury in the past does not change the fact that the present illness clearly is causally related to the injuries sustained at work in December of 1989.  This is not a pre-existing condition.  *The patient's severe headaches, vestibular dysfunction and cognitive and memory impairment all make it impossible for her to perform any type of work in any capacity whatsoever.  At this point, more than four years following the injury, these conditions are permanent. There is no reason to ever expect any improvement in her situation.  The patient is 100% impaired and will remain so permanently.  There is no therapy, medication or any other type of treatment which will enable her to ever return to any type of work whatsoever.*[5]

(LINA 657 (emphasis added); *see also* LINA 714 (handwritten note, dated May 4, 1993, indicating that Plaintiff was "totally and permanently disabled" and "unable to work at any

---

[4]    This Court infers that "organic mental syndrome" is the same as "organic mental disorder," synonymous with "organic brain syndrome," which is the "general term used to describe decreased mental function due to a mental disease, other than a psychiatric illness," such as a head injury (*e.g.*, concussion).  Most variations of this disorder are "*long-term* or get worse over time," and often result in the individuals' *loss of the "ability to interact with others or function on their own*."    PubMed Health, *Organic Brain Syndrome* (2012), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002374 (emphasis added).

[5]    Notwithstanding this prognosis, LINA apparently did not transfer Plaintiff to its "SAM," or stable and mature, category, which would have entitled her to the presumption of permanent disability and only required that she furnish once per year proof of such disability.  (Tr. 108-109.)

occupation").)   LINA requested but did not require Dr. Casson to submit treatment notes in support of this report.[6]   (LINA 684, 722, 747-48.)

On April 8, 1994, a psychiatrist who had started seeing Plaintiff about a year prior, Dr. Kishore Saraf, prepared a letter, which was provided to LINA and indicated, *inter alia*, that, based on his examination and treatment of Plaintiff, he had diagnosed her with organic mental disorder "secondary to concussion" and organic mood disorder.[7]   (LINA 619, 622.)   Like Dr. Casson, Dr. Saraf concluded that Plaintiff was permanently disabled:

> In view of the persistence of affective cognitive and neuropsychiatric deficits that the patient is still showing despite being medication free for six weeks, and my repeated observation upon examination, it leaves me to conclude that patient has suffered *permanent* Organic Mental Disorder secondary to the concussion and fully [sic] recovery to her preconcussion level seems *impossible*.   In short, the patient is *permanently disabled* as a consequence of the head injury she suffered on December 12, 1989.

(LINA 622 (emphasis added).)

Dr. Saraf also submitted a response to the report of LINA's independent medical examiner, who had disagreed with Drs. Casson's, Zanger's, and Saraf's conclusions that Plaintiff was suffering from "organic" disorders as a result of her head injury.   (LINA 600-601, 632-34.) In response, Dr. Saraf defended his diagnoses and additionally diagnosed Plaintiff with "Major Affective Disorder—AKA Manic depressive disorder, bipolar, depressed, nonpsychotic—

---

[6]      On November 11, 1993, after already approving the continuation of Plaintiff's long term disability benefits *without* Dr. Casson's treatment notes, LINA suggested that it still needed these notes to continue processing the claim.   (LINA 678, 684.)   As LINA noted, the single page of notes that Dr. Casson subsequently sent (LINA 677) "d[id] not tell us much."   (LINA 674.) LINA declined to request more notes from Dr. Casson.

[7]      Mood disorder describes a "group of mental disorders involving a disturbance of mood, accompanied by either a full or partial manic or depressive syndrome that is not due to any other mental disorder," where "mood" is defined as a "*prolonged* emotion that *colors the whole psychic life*."   This "group of mental disorders" includes bipolar disorder and depression. Stedman's Med. Dictionary 116700 (27th ed. 2000) (emphasis added).   (Any disorder is "organic" if it "relat[es] to an organ" in the body.  *Id.* at 286000.)

precipitated by and directly attributable to stress caused by" Plaintiff's "Cognitive disorder NOS-post concussional disorder."[8] (LINA 601.) LINA did not require Dr. Saraf to submit treatment notes in support of these reports. (LINA 591, 606, 616.)

On May 17, 1995, LINA received a Supplementary Claim form ("Supplementary Claim form") completed by Dr. Saraf, verifying that Plaintiff remained totally disabled for any occupation due to her mental impairments. (LINA 580-82.) Dr. Saraf also verified that Plaintiff was not a suitable candidate for rehabilitation. (LINA 582.) LINA did not require Dr. Saraf to submit treatment notes in support of this form. (LINA 583-84.)

The following year, on March 28, 1996, Dr. Saraf submitted to LINA another Supplementary Claim form, again confirming Plaintiff's continuing total disability for any occupation and her unsuitability for rehabilitation. (LINA 564-65.) This time, LINA did require that Dr. Saraf submit treatment notes in support of this form. (LINA 472, 537, 552, 560-61.) Dr. Saraf faxed these notes to LINA on September 20, 1996. (LINA 461-68.) In an undated set of notes, Dr. Saraf indicated that "[m]y prognosis for this patient's return to work is *poor* because of her Neuro Psychiatric disability" and that "her current neuropsychiatric symptomatology in my opinion is . . . likely to continue *indefinitely*." (LINA 463 (emphasis added).)

In September and November 1997, "for the continued management of [Plaintiff's] claim," LINA requested that Dr. Saraf provide updated medical proof that Plaintiff continued to be totally disabled, *i.e.*, an Evaluation of Psychiatric Impairment form and treatment notes. (LINA 410, 414.) On February 10, 1998, because Dr. Saraf had failed to provide both the form

---

[8]     Bipolar disorder, also known as "manic depression" or "bipolar affective disorder," is the "condition in which a person has periods of depression and periods of being extremely happy or being cross or irritable." In spite of any treatment, "[p]eriods of depression or mania *return in most patients*" who have this disorder. PubMed Health, *Bipolar Disorder* (2013), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001924 (emphasis added).

*and* treatment notes, LINA temporarily denied Plaintiff's long term disability benefits.  (LINA 400-401.)  Shortly thereafter, LINA received an Evaluation of Psychiatric Impairment form completed by Dr. Saraf.  (LINA 394-95.)  LINA's medical consultant additionally reviewed the claim file, and concluded that Plaintiff's "medical docs support [her] psychiatric condition of Bipolar disorder, T/D [totally disabled] A/O [for any occupation]."  (LINA 385, 388; Tr. 115.)[9] LINA reinstated Plaintiff's long term disability benefits without requiring Dr. Saraf's treatment notes.  (LINA 382, 385; Tr. 115.)

On August 3, 1998, LINA received a Supplementary Claim form completed by Dr. Saraf, diagnosing Plaintiff with Bipolar Disorder and confirming her continuing total disability for any occupation.  (LINA 365-66.)  On this form, Dr. Saraf merely suggested that Plaintiff could "possibly" resume working in the future.  (LINA 366.)  LINA did not require Dr. Saraf to submit treatment notes in support of this form.  (LINA 368, 371.)

On September 28, 1999, LINA received a Supplementary Claim form completed by a new psychiatrist, Dr. Ram Pardeshi, diagnosing Plaintiff with "Depression/Bipolar disorder." (LINA 352-54.)  Unlike the prior versions of the Supplementary Claim form, the version that Dr. Pardeshi completed did not ask whether the claimant was totally disabled.  (LINA 354.)  Rather, in the section entitled "Extent of Disability," this version asked only "When was patient able to go to work?" with blanks for the pertinent dates.  (*Id.*)  Dr. Pardeshi did not fill in those blanks and responded instead with "undetermined" and "manic episode followed by depressive episode."  (*Id.*)  Like Dr. Saraf, Dr. Pardeshi indicated that Plaintiff was not a suitable candidate for rehabilitation.  (*Id.*)  LINA did not require Dr. Pardeshi to submit treatment notes in support

---

[9]     "Dr. Lepkof," or "Dr. L," was LINA's medical consultant; whereas "T/D H/O" meant totally disabled for her occupation, "T/D A/O" presumably meant totally disabled for *any* occupation.  (Tr. 112, 114-15.)

of this form.  (LINA 357, 361; *see also* LINA 337 (stating, on October 25, 1999, that LINA was "[o]kay to continue" based on the form from Dr. Pardeshi).)

On June 15, 2001, LINA received a Disability Claim form completed by Dr. Pardeshi, which was substantively similar to Dr. Pardeshi's Supplementary Claim form.  (LINA 166-67.) Dr. Pardeshi confirmed Plaintiff's diagnoses for bipolar disorder, depression, post-concussion syndrome, and anxiety disorder.  (LINA 166.)  Dr. Pardeshi also indicated that Plaintiff demonstrated, *inter alia*, severely impaired short and long term memory, severe confusion, moderate paranoia, and thought disorder.  (LINA 167.)  Finally, Dr. Pardeshi concluded that Plaintiff was "unable to function or work," incapable of performing any occupation, and unsuited for rehabilitation.  (*Id.*)  The same day that LINA received this form, one of its reviewers recommended that Plaintiff's claim be considered for "MMI [maximum medical improvement] and SAM [stable and mature] tx [transfer]."[10]  (LINA 163; Tr. 108-109, 114.)  This time, LINA did require that Dr. Pardeshi submit treatment notes in support of this form.  (LINA 161-62, 330, 340.)  Dr. Pardeshi faxed these notes to LINA on August 31, 2001.  (LINA 151-54.)  In these notes, Dr. Pardeshi recited the above diagnoses, gave Plaintiff a Global Assessment of Functioning ("GAF") score of 40,[11] and concluded that "[d]ue to her severe illness which is of *chronic* nature[,] her disability should be continued."  (LINA 152-53 (emphasis added).)

On July 17, 2003, LINA sent Plaintiff a letter requesting the completion and submission of a medical release form by Plaintiff, as well as a Psychiatric Functional Assessment ("PFA")

---

[10]     *See supra* note 5.  "MMI," or maximum medical improvement, meant that the claimant had improved as much as she could possibly improve.  (Tr. 114.)

[11]     GAF scores in the range of 31-40 reflect "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is *unable to work*; child frequently beats up younger children, is defiant at home, and is failing at school)."  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32 (4th ed. 1994) (emphasis added).

form and treatment notes by Plaintiff's psychiatrist.  (LINA 145-49.)  On September 18, 2003, LINA received both forms, but no treatment notes.  (LINA 139-43.)  In the PFA form, Dr. Pardeshi confirmed Plaintiff's diagnoses for bipolar disorder and depression.  (LINA 141.)  Dr. Pardeshi also concluded that Plaintiff was "unable to function in work setting or in social setting," and that he did not know when she would be able to return to work.  (LINA 142.)

        2.   LINA's Denial of Plaintiff's Long Term Disability Benefits in December 2003

In two letters dated October 29, 2003 and November 10, 2003 and a telephone call on December 12, 2003, LINA notified Plaintiff that the information from Dr. Pardeshi was insufficient to support her claim of continuing total disability, because he had not yet provided his "office/treatment notes."  (LINA 126; *see* LINA 115, 129.)

By letter dated December 23, 2003, LINA advised Plaintiff that it was denying her long term disability benefits *after December 21, 2003*, due to Dr. Pardeshi's failure to provide his treatment notes for the period from January 1, 2002 to December 23, 2003.  (LINA 108-10.)  The letter noted that "the *weight of the evidence in your claim file* does not support your inability to perform your regular occupation or any occupation."  (LINA 109 (emphasis added).)  The letter, however, invited Plaintiff to submit more medical information to support her total disability, dating back to January 1, 2002.  (*Id.*)   Finally, the letter notified Plaintiff that she had the "right to bring legal action under ERISA section 502(a)" if her administrative appeal before LINA was denied, but it did not specify any time limit for filing such an action.  (*Id.*)

3.   Plaintiff's Post-December 2003 Treatment

Following the denial of Plaintiff's long term disability benefits in December 2003, Plaintiff had difficulty finding a new psychiatrist.[12]  (Tr. 18, 39.)  On May 25, 2004, Plaintiff went to the emergency room of Long Island Jewish Medical Center after "feeling very down and hopeless."  (LINA 101, 105; Tr. 40.)  The hospital discharged her with an instruction to "[f]ollow up with psychiatry appointment at Creedmoor tomorrow."  (LINA 105.)

On June 15, 2004, Plaintiff started seeing Dr. Wendy Wang, a psychiatrist at Creedmoor Psychiatric Center ("Creedmoor").[13]  (LINA 54, 72-77; Tr. 18.)  Consistent with the diagnoses by Plaintiff's prior psychiatrists, Dr. Wang diagnosed Plaintiff with bipolar disorder and mood disorder secondary to organic brain disorder.  (*Compare* LINA 72 *with* LINA 353 (Dr. Pardeshi); LINA 601, 622 (Dr. Saraf); *and* LINA 652 (Dr. Zanger).)  Dr. Wang noted, *inter alia*, that Plaintiff had been experiencing the same mood symptoms *since* her accident in December 1989. (LINA 73.)

The same day, Plaintiff also met with a Creedmoor social worker, Patsy James, who, upon evaluation, noted that Plaintiff's "lack of ability to concentrate, focus, remember [and] constant headaches *over past 10-15 yrs* have interfered with her ability to participate in work program, vocation."  (LINA 70-71 (emphasis added).)

---

[12]    Plaintiff testified at trial that Dr. Pardeshi actually closed his practice, sometime before the denial of her long term disability benefits, around October or November 2003.  (Tr. 18, 138.)

[13]    Creedmoor, located in Queens Village, New York, is alternatively referred to as "Queens Village" in the administrative record.  *See* http://www.omh.ny.gov/omhweb/facilities/crpc/ facility.htm (last visited Aug. 16, 2013).  According to Dr. Wang's notes, Plaintiff had originally been referred to Creedmoor in February 2004 by her prior psychiatrist—presumably, Dr. Pardeshi—because he had closed his practice.  (LINA 73.)

On July 12, 2004, Plaintiff started seeing another psychiatrist at Creedmoor, Dr. Elsa Mirasol, who reported that Plaintiff was "*still* actively depressed."  (LINA 57-58 (emphasis added).)

### 4.  LINA's Denials of Plaintiff's Administrative Appeals

On June 21, 2004, Plaintiff informed LINA that she was administratively appealing its decision to deny the payment of her long term disability benefits.  (LINA 100-105.)  In her letter to LINA, she stated that Dr. Pardeshi was closing his practice and that she was therefore unable to obtain the treatment notes that LINA requested.  (LINA 101.)  She further pointed out that LINA had not previously requested such notes but had been satisfied by her physicians' completion and submission of LINA's various forms.  (*Id.*)  Plaintiff also apprised LINA about her visit to Long Island Jewish Medical Center's emergency room in May 2004 and about her appointments with Dr. Wang and Ms. James at Creedmoor in June 2004.  (*Id.*)  Finally, Plaintiff indicated that she had an upcoming appointment at Creedmoor and would provide LINA with a report once she got it.  (*Id.*)

On August 17, 2004, LINA received a letter from Ms. James.[14]  (LINA 85.)  In the letter, Ms. James reported that Plaintiff was "receiving psychiartic [sic] services for her diagnosis of Bipolar Disorder" and was "being prescribed psychotrophic [sic] medications to treat Depression."  (*Id.*)  Ms. James explained that Plaintiff had a "*long history* of experiencing difficulty concentrating, memory loss, poor sleep, crying spells, and anxiety" along with a "history of suicidal ideation," and was "unable to work due to inability to focus, concentrate, and difficulty remembering."  (*Id.* (emphasis added).)  Ms. James verified that Plaintiff was seeing a psychiatrist on a monthly basis and a social worker on a weekly basis.  (*Id.*)

---

[14]    In mailing Ms. James's letter to LINA, Plaintiff explained on the cover page that Creedmoor had already twice attempted to fax this letter.  (LINA 83.)

By letter dated September 9, 2004, LINA denied Plaintiff's first administrative appeal. (LINA 79-80.)  LINA's letter stated that it had denied Plaintiff's long term disability benefits back in December 2003, because she had not provided "any updated medical information to support [her] continuing disability." (LINA 79.)  The letter also stated that LINA had attempted unsuccessfully to obtain information from the psychiatrists at Creedmoor, and that the information from Ms. James was insufficient to show "[Plaintiff's] inability to work at the time [her] claim was denied and on a continuous date up to the present date." (*Id.*)  The letter notified Plaintiff that she had 180 days to appeal this denial and still had the "right to bring legal action under ERISA section 502(a)," without specifying the deadline for such an action.  (LINA 79-80.)

On January 3, 2005, Plaintiff informed LINA of her second administrative appeal. (LINA 53.)  LINA received, in support of Plaintiff's second administrative appeal, Dr. Wang's and Ms. James's initial evaluations from June 2004 (LINA 67-77), as well as the treatment notes by other psychiatrists and social workers at Creedmoor between June 15, 2004 and September 13, 2004 (LINA 54-65).  In addition to confirming Plaintiff's longstanding diagnoses for organic mental and mood disorders and bipolar disorder, and the persistence of her mood symptoms since 1989, the information from Creedmoor also confirmed that Plaintiff was "chronically depressed." (LINA 62.)  In one set of notes on July 22, 2004, Dr. Mirasol wrote:  "Pt. is *chronically* depressed.  From past records, she has *continually* reported similar complaints." (*Id.* (emphasis added).)  At that time, Dr. Mirasol was "[d]istantly considering a possibility of ECT [electroconvulsive therapy] trial" for Plaintiff.[15] (*Id.*)

---

[15]    Electroconvulsive therapy, which "uses electricity to trigger a seizure," is typically employed to treat "*severe* depression."   PubMed Health, *Electroconvulsive Therapy* (2012), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004946 (emphasis added).

By letter dated March 10, 2005, LINA denied Plaintiff's second administrative appeal. (LINA 49-51.) LINA's letter stated that its decision was based on "all documents contained *in your claim file, viewed as a whole*." (LINA 50 (emphasis added).) The letter, however, focused on Plaintiff's failure to demonstrate her continuing total disability *after* the denial of her long term disability benefits in December 2003:

> I am aware that you have been off work since September 18, 1990 due to bipolar disorder. As part of your appeal, you submitted, [sic] medical records from Creedmoor Psychiatric Center from June 15, 2004 through September 14, 2004. Please note that these medical records are six months after your Long Term Disability benefits ended, which was 12/21/03. *These records do not provide evidence of continuous Disability going back to December 21, 2003.* Further, as outline above in the section entitled "Termination of Insurance", insurance coverage ends when your Disability Benefits end. Your Disability benefits ended as of December 21, 2003, therefore your Insurance coverage ended as of that date. As of June 15, 2004, which is when the medical records you submitted began, you were no longer covered for Long Term Disability insurance.

(LINA 50-51 (emphasis added).) The letter later reiterated the importance of information from this post-December 2003 period: "[A]s we have no medical evidence to support Total Disability from your occupation on a continuous basis *from December 21, 2003 forward*, you have not met the Definition of Disability." (LINA 51 (emphasis added).) The letter notified Plaintiff that she had exhausted her administrative appeals, and that, although LINA would not consider any further appeals, she maintained the "right to bring legal action regarding [her] claim under the ERISA section 502(a)" within a period of time that the letter did not specify. (*Id.*)

    5.  Summary of Plaintiff's Claim History

Based on the above findings of fact, the claim history for LINA's payment of long term disability benefits to Plaintiff is summarized as follows:

Between March 17, 1991 and December 21, 2003, LINA paid Plaintiff long term disability benefits, in light of Plaintiff's total disability resulting from the head injury that she sustained at work in December 1989. Throughout this period, Plaintiff was repeatedly diagnosed

with organic brain or mental disorder, and found totally disabled.  Although LINA required Plaintiff's physicians to submit, at least annually, reports or forms attesting to her continuing total disability, LINA did not always require the submission of treatment notes in support of these reports or forms.

The events that precipitated the termination of Plaintiff's coverage under the Policy and denial of her long term disability benefits began in November 2003:  LINA required Plaintiff to provide additional information, in the form of treatment notes, from Dr. Pardeshi, to support his PFA form, which verified Plaintiff's continuing total disability.  Because Dr. Pardeshi was closing his practice at that time, Plaintiff was unable to obtain this information.  On December 21, 2003, LINA ceased paying Plaintiff long term disability benefits.

In May 2004, after struggling to find a new psychiatrist, Plaintiff visited the emergency room at Long Island Jewish Medical Center.  Plaintiff was then referred to Creedmoor, where she saw several psychiatrists and social workers starting in June 2004.  The psychiatrists at Creedmoor diagnosed Plaintiff with organic mood disorder secondary to organic brain disorder, bipolar disorder, and chronic depression, and concluded, *inter alia,* that Plaintiff had been experiencing the same mood symptoms since December 1989.

In June 2004, Plaintiff administratively appealed LINA's denial of her long term disability benefits.  In August 2004, she provided LINA with a letter from a Creedmoor social worker, Ms. James, stating, *inter alia*, that Plaintiff had been receiving psychiatric treatment and was unable to work.

On September 9, 2004, LINA denied Plaintiff's first administrative appeal, in part, because Ms. James's letter did not sufficiently demonstrate Plaintiff's continuing total disability from December 2003 onward.

In January 2005, Plaintiff appealed again. LINA received medical information from Creedmoor, consisting of initial evaluations and treatment notes between June 2004 and September 2004. This information included Dr. Wang's finding that Plaintiff had been suffering from the same mood symptoms since December 1989 and Dr. Mirasol's finding that Plaintiff was "chronically depressed."

On March 10, 2005, LINA denied Plaintiff's second and final administrative appeal, citing the reason that Plaintiff still had not provided proof of her continuing total disability since the denial of her long term disability benefits in December 2003. According to LINA, the medical information in support of Plaintiff's administrative appeal did not cover the period between December 2003 and June 2004 and was therefore insufficient.

### B. Workers' Compensation Offset

On January 18, 1995, as determined by the New York State Workers' Compensation Board, Plaintiff received a lump sum workers' compensation award in the amount of $29,490, based on the workplace injuries she sustained in December 1989. (LINA 452, 545; Pl. Ex. C, at 1-2; Tr. 13-14.) Prior to the issuance of this award, Plaintiff also received workers' compensation benefits in the amount of $100 per week from November 22, 1993 to March 28, 1995. (LINA 177, 449; *see* Tr. 62.)

In February 1995, pursuant to a third-party settlement in the amount of $165,000 with the owners of the building where Plaintiff's injuries occurred, Plaintiff consented in writing to waiving the lump sum workers' compensation award. (Tr. 15-16, 62-63; *see also* LINA 413 (noting that "payment [of lump sum workers' compensation award] was stopped as [Plaintiff] settled her 3rd party suit w/out our consent," and that "she was not interested in pursuing wc claim"); 547 (Plaintiff's workers' compensation lawyer advising that Plaintiff "wishes to close

her Workers' Compensation claim," citing the fact that she "accepted the third party settlement").)

On June 8, 1995, CNA Risk Management, State Farm's workers' compensation carrier, issued Plaintiff a check for the $29,490 lump sum workers' compensation award, but she never cashed the check and simply allowed an automatic stop payment on it after six months.  (LINA 176, 347, 452, 545; Pl. Ex. C, at 2.)

The Policy provided for offsets of monthly long term disability benefits based on the claimant's receipt of "Other Benefits," including workers' compensation.  (LINA 28, 30.)  The Policy also contained an "Assumed Receipt of Benefits" provision:

> If [the claimant] is covered under the Federal Social Security, Worker's Compensation, or similar laws, he will be assumed to be receiving such benefits for himself (and for his dependents, if applicable). These assumed benefits will be in amount the Insurance Company estimates he (and his dependents, if applicable) is *eligible* to receive. This assumption will not be made if [the claimaint] gives the Insurance Company proof that:
> . . .
> (2) payments were *denied*.

(LINA 31.)  Thus, under the Policy, LINA could, *inter alia*, offset any lump sum workers' compensation award for which Plaintiff was "eligible," even if she waived and never collected it, so long as her claim was not "denied."

Plaintiff received $872 in monthly long term disability benefits, before the application of any offsets.  (LINA 178, 484.)  Based on the "Assumed Receipt of Benefits" provision, LINA was entitled to offset such benefits by $91.02 per month, because of the lump sum workers' compensation award, for net benefits of $780.98 per month until the end of Plaintiff's coverage under the Policy.  (*Id.*)

Under the Policy, claimants who became totally disabled at the age of 62 or younger, could only obtain long term disability benefits until "[t]he later of: (a) the last day of the month

coincident with the [claimant's] 65th birthday; or (b) the date the 42nd Monthly Benefit is payable[.]"  (LINA 11.)  Because Plaintiff, born in August 1941, became totally disabled before the age of 62, she was only eligible to receive long term disability benefits *until August 31, 2006*, "the last day of the month coincident with [her] 65th birthday."[16]  (LINA 1.)

Thus, if LINA had not denied Plaintiff's long term disability benefits *after December 21, 2003*, the total amount of benefits that Plaintiff would have received is $25,243.29.[17]

### C.  Plaintiff's Notice Regarding the Three-Year Statute of Limitations

Plaintiff commenced this action on December 16, 2009, more than four years after LINA's denial of her second and final administrative appeal on March 10, 2005.  (Compl., at 1; LINA 49-51.)

At trial, the parties presented evidence on the issue of whether Plaintiff received notice of the three-year limitations period that applies to legal actions brought to recover benefits under the Policy.  LINA's copy of the Policy in the administrative record contained a two-page insert with a provision notifying claimants of the three-year limitations period.  (LINA 44-45; *see also* Tr. 83 (Mr. Lodi testifying that a "copy of the relevant policy" would have been placed in the claim file).)

Plaintiff introduced as evidence the copy of the Policy that she received from State Farm in December 2003.  (Pl. Ex. A; Tr. 41.)  Plaintiff's copy of the Policy did not contain the two-

---

[16]    Between March 17, 1991, when Plaintiff began receiving long term disability benefits, and December 21, 2003, when such benefits were denied, Plaintiff received over 42 monthly benefit payments.

[17]    This Court calculates $25,243.29 by adding (i) the prorated amount of $251.93 for the 10 days in December 2003 after the denial of Plaintiff's long term disability benefits, and (ii) the amount of $24,991.36 for the 32 months until the month of her 65th birthday.  In its post-trial submission of proposed findings of fact and conclusions of law, LINA improperly calculated a lower amount ($24,827.35) by, *inter alia*, applying a higher offset ($92 per month) and only accounting for benefits until the middle of August 2006.  (Dkt. No. 51 ("Def. PFFCL"), at 11 ¶¶ 43-46.)

page insert with the provision for the three-year limitations period.  (Pl. Ex. A, at 11-12.)
Plaintiff testified that, although she unstapled her copy of the Policy to photocopy and attach it to
her complaint in this action, and may have unstapled it for photocopying on later occasions, she
did not remove the two-page insert.[18]  (Tr. 42-44, 46-47.)

In addition to the evidence adduced at trial, this Court's own review of the administrative
record reveals that:

- On April 21, 1993, Stephanie Bass, a claims administrator at LINA, wrote to Plaintiff, "We have enclosed a copy of your policy for your perusal[.]"  (LINA 723.)

- On May 31, 1994, Ms. Bass "enclosed a copy of the applicable policy for [Plaintiff]" in a letter to Plaintiff's workers' compensation lawyer.  (LINA 609-11.)

- On June 28, 1996, Plaintiff wrote to Ms. Bass, asking for a copy of the Policy to clarify if it required the submission of medical reports.  (LINA 534.)  There is, however, no evidence in the administrative record that Ms. Bass sent Plaintiff the Policy at this time.  (Lodi Decl. ¶ 11.)

This Court considers whether any copy of the Policy that LINA sent to Plaintiff in April
1993 and possibly in May 1994 and June 1996 would have been the copy in the administrative

---

[18]     This Court finds that the evidence adduced at trial was insufficient to show that Plaintiff's
copy of the Policy from State Farm contained the provision for the three-year limitations period.
Plaintiff credibly testified that her copy did not contain this provision.  (Tr. 10-12.)  Moreover,
multiple discrepancies between LINA's and Plaintiff's copies of the Policy undermine the
conclusion that Plaintiff's copy was the same as LINA's copy, or that it contained this provision,
which was buried in a two-page insert with inexplicably inconsistent pagination from the rest of
the Policy.  (LINA 44-45; *compare* LINA 7-12 *with* Pl. Ex. A.)  LINA argued that Mr. Lodi
"credibly explained" the inconsistent pagination by testifying that the Policy was "updated in a
way that simply [didn't] len[d] itself to someone numbering them one through 40."  (Def.
PFFCL, at 10 ¶ 34; Tr. 97.)  This Court, however, finds that Mr. Lodi's testimony failed to
explain this and other discrepancies between Plaintiff's and LINA's copies.  Finally, LINA's
copy was unsigned, whereas Plaintiff's copy was signed by LINA and State Farm.  (*Compare*
LINA 47 *with* Pl. Ex. A.)  While a logical explanation for this discrepancy could exist, LINA has
not offered one.  (Tr. 98 (Mr. Lodi testifying that he could not explain why LINA's copy was
unsigned).)  Nor did LINA seek to introduce the copy of the Policy in State Farm's records or
any evidence about what State Farm distributed to its employees, which would have been far
more probative on the issue of whether Plaintiff's copy contained this provision.

18

record.[19]   At trial, Mr. Lodi testified that Plaintiff's "claim file," which was the administrative

record, consisted of correspondence on the right-hand side in reverse chronological order and,

separately, the copy of the Policy on the left-hand side.  (Tr. 80-81, 83.)    In his sworn, post-

trial declaration, Mr. Lodi, stated that:

> [Although] LINA is unable to determine with certainty what version of the Policy
> was sent to Plaintiff with the letter from Stephanie Bass dated April 21, 1993 (LINA
> 0723) because LINA does not keep copies of documents that are sent as
> enclosures. . . . it is LINA's practice to provide the version of the policy that was in
> effect on a claimant's claim incur date.  *Based on that, the 1989 version of the Policy
> (LINA 7-47) would have been sent to the Plaintiff.*

 (Lodi Decl. ¶ 10 (emphasis added).)  Mr. Lodi also confirmed that Plaintiff was covered by the

copy of the Policy in Plaintiff's "claim file," *i.e.*, the administrative record, which had an

effective date of January 1, 1989, and that the Policy contained the provision for the three-year

limitations period.  (*Id.* ¶¶ 5, 7.)

Accordingly, this Court finds that Plaintiff received notice of the limitations period, at

least in April 1993, when Ms. Bass sent Plaintiff the copy of the Policy in the administrative

record maintained by LINA.  There is no evidence, however, that Plaintiff actually read about or

was aware of the limitations period until after she initiated this action.

II. Conclusions of Law

A. *Standard of Review*

This action arises under Section 502(a)(1)(B) of the Employee Retirement Income

Security Act of 1974 ("ERISA"), *codified at* 29 U.S.C § 1132(a)(1)(B) ("Section 502(a)(1)(B)").

Section 502(a)(1)(B) provides that any "participant or beneficiary" in an employee benefit plan

---

[19]     Although Plaintiff's workers' compensation lawyer received from Ms. Bass a copy of the
Policy in May 1994 (LINA 609), and Plaintiff requested from Ms. Bass a copy of the Policy in
June 1996 (LINA 534), this evidence alone does not prove that Plaintiff actually received
LINA's copy of the Policy at these points in time.

may bring a "civil action . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

The "appropriate standard of review" in Section 502(a)(1)(B) actions is *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 105, 115 (1989); *see, e.g.*, *Hamill v. Prudential Ins. Co. of Am.*, No. 11-cv-1464, 2013 WL 27548, at *2-4 (E.D.N.Y. Jan. 2, 2013) (Townes, J.) (applying *Firestone*'s *de novo* standard of review to claim involving a defendant insurer's long term disability plan); *Alexander v. Winthrop, Stimson, Putnam & Roberts Long Term Disability Coverage*, 497 F. Supp. 2d 429, 433 (E.D.N.Y. 2007) (Dearie, C.J.) (same); *Barnable v. First Fortis Life Ins. Co.*, 44 F. Supp. 2d 196, 202-204 (E.D.N.Y. 1999) (Seybert, J.) (same).

For the "administrator or fiduciary" of an employee benefit plan to satisfy its burden of proving that it had "discretionary authority," the plan "need not actually use the words 'discretion' or 'deference' to be effective"; nonetheless, the plan "must be clear," and "language that establishes an objective standard does not reserve discretion."  *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 108 (2d Cir. 2005) (describing a short and long term disability plan, which stated that "a disability exists when [the defendant insurer] determines that all of these conditions are met" and that the defendant insurer "will pay benefits when [it] receives written proof of the loss," as "vest[ing] no discretion" (quotations omitted)).

Here, the Policy did not contain language conferring discretion on LINA.  (*See, e.g.*, LINA 23 ("will be considered Totally Disabled if"), 28 ("The Monthly Benefit for any month is 50.00% of the Employee's Monthly Basic Earnings at the time he becomes Totally

Disabled[] . . . . [and] will not be less than $250.00[.]").)  In any event, LINA, which bore the burden of proof, specifically conceded that it lacked such discretion.  (Def. PFFCL, at 12 ¶ 2); *see Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 293 n.2 (2d Cir. 2004) (applying *de novo* standard of review, where "[t]he parties do not dispute that the Plan here does not confer such discretionary authority on the insurer or that the *de novo* standard applies")

Accordingly, this Court reviews *de novo* LINA's decision to deny the payment of long term disability benefits to Plaintiff.  In conducting such a review, this Court need not "defer[] to [LINA's] evaluation of the evidence."  *Locher*, 389 F.3d at 296.

### B.  *Scope and Weight of Evidence*

Even where a *de novo* standard of review applies in Section 502(a)(1)(B) actions, "[t]he presumption is that judicial review 'is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence.'"  *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 125 (2d Cir. 2003) (quoting *DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 66 (2d Cir. 1997)).  The finding of "good cause" to overcome this presumption and consider evidence from outside the administrative record is "within the discretion of the district court."  *Muller*, 341 F.3d at 125.  This Court, in its discretion, still finds "good cause" to consider extra-record evidence (Pl. Exs. A; C)  relating to (i) Plaintiff's notice of the three-year limitations period and (ii) the offset based on a lump sum workers' compensation award.

In deciding the issues of fact in this action, this Court ultimately imposes on Plaintiff the "burden of proving by a preponderance of the evidence that [she] [wa]s totally disabled" under the Policy, and that therefore LINA should not have denied her long term disability benefits. *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006).  Under the Policy, Plaintiff would have been considered "Totally Disabled" if, after receiving long term disability

21

benefits for more than 24 months, she was still unable to "actively work in any 'substantially gainful occupation.'"  (LINA 23.)

### C.   Statute of Limitations

Because ERISA "does not prescribe a limitations period for 29 U.S.C. § 1132 actions" such as this one, "the applicable limitations period is that specified in the most nearly analogous state limitations statute." *Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 78 (2d Cir. 2009) (per curiam) (quotations omitted).  The "most nearly analogous" limitations period is New York's six-year statute of limitations for contract actions. *Id.* (citing N.Y. C.P.L.R. 213).  New York, however, also permits parties to establish a shorter limitations period by written agreement.  *Id.* (citing N.Y. C.P.L.R. 201).[20]

---

[20]   Throughout the stages of litigation in this action, the parties have assumed that this Court should look to the law of New York, as the forum state, for the "most nearly analogous" limitations period. *See Muto v. CBS Corp.*, 668 F.3d 53, 57 (2d Cir. 2012) (noting that "ordinary practice" dictates that "the applicable limitations period in this § 1132 action is 'that specified in the most nearly analogous . . . limitations statute' *of the forum state*" (emphasis added) (quoting *Miles v. N.Y. State Teamsters Conference Pension & Ret. Fund Emp. Pension Benefit Plan*, 698 F.2d 593, 598 (2d Cir. 1983))); *Sandberg v. KPMG Peat Marwick, L.L.P.*, 111 F.3d 331, 333 (2d Cir. 1997) (considering, for a Section 502(a) action, the "most analogous" limitations period under New York law, where "New York is the forum state, and the parties agree that New York law applies").

This Court's own review of the administrative record, however, reveals that the Policy contained the following choice of law provision:  "This contract shall be governed by the laws of the state in which it is delivered," *i.e.*, Illinois.  (LINA 20.)  In light of such a provision, this Court should arguably look to the law of Illinois, as the chosen state, for the "most nearly analogous" limitations period. *See Wang Labs., Inc. v. Kagan*, 990 F.2d 1126, 1128-29 (9th Cir. 1993) (holding that "[i]n an ERISA case, we ordinarily borrow the forum state's statute of limitations," but that "[w]here a choice of law is made by an ERISA contract, it should be followed"); *see also Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 816 (7th Cir. 2010) (deeming, as a factor in deciding to apply the limitations period under another state's law as opposed to the forum state's law, the fact that "the [ERISA] Plan contains a choice of law provision"); *cf. Greenberg v. Aetna Life Ins. Co.*, 421 F. App'x 124, 125 (2d Cir. 2011) (holding that, because "the policy on its face elects Pennsylvania law as controlling its interpretation and stipulates that it is to be delivered in Pennsylvania," the law of Pennsylvania, not New York, applies "to the extent not preempted by ERISA").

Specifically, under New York law, a group policy, like LINA's Policy, (i) cannot contain a limitations period shorter than two years after proof of loss is required by the policy and (ii) shall contain a provision which specifies such period.  N.Y. Ins. Law § 3221(a); *see also Burke*, 572 F.3d at 78 n.1 (applying N.Y. Ins. Law § 3221(a) to long term disability plan with three-year limitations period).   Any policy that fails to satisfy the second requirement is governed by the six-year limitations period for contract actions.  *Med. Facilities, Inc. v. Pryke*, 62 N.Y.2d 716, 717 (1984) (applying six-year limitations period, because "[a]n insurer who issues a policy omitting reference to the shortened limitations period, in violation of statutory mandate [under New York Insurance Law], cannot claim the benefit of its own omission, for an insured would otherwise have no notice that his time to commence suit was different from that provided by law for any contract action").

This Court finds that the Policy contained a provision specifying a shorter limitations period of "*3 years . . .* after the time within which proof of loss is required by the policy." (LINA 44 (emphasis added).)[21]  Based on this provision, Plaintiff's claim would be time-barred, regardless of whether the limitations period began running on (i) December 17, 2003, the "Proof of Loss Date" (LINA 476), or (ii) March 10, 2005, when Plaintiff exhausted all of her

_____

This Court, however, need not resolve this relatively unsettled issue:  although the "most nearly analogous" limitations period in Illinois (ten years) is longer than the one in New York (six years), Illinois law, like New York law, also allows the parties to agree on a shorter limitations period.  *Accord Koclanakis v. Merrimack Mut. Fire Ins. Co.*, 899 F.2d 673, 675 (7th Cir. 1990) ("Illinois law recognizes the validity of reasonable contractual limitations on the time to file suit."); *Jenkins v. Local 705 Int'l Bhd. of Teamsters Pension Plan*, 713 F.2d 247, 253-54 (7th Cir. 1983) (holding that the "most analogous Illinois statute of limitations" for a Section 502(a)(1)(B) action is the ten year limitations period for "actions on a written contract").  Accordingly, whether this Court looks to New York or Illinois law, its analysis regarding the shorter limitations period stays the same.

[21]   This provision is permissible, as it provides for a "more favorable" limitations period than the minimum of two years required under New York Insurance Law.  *See* N.Y. Ins. Law § 3221(a); *Burke*, 572 F.3d at 78 n.1.

administrative appeals (LINA 49-51).  *See Burke*, 572 F.3d at 79-81 (holding that limitations periods may start to run after the plaintiff's proof of loss is required, but before her legal claims have accrued).  Plaintiff did not commence this action until December 16, 2009, four years and nine months after the latest date.

The sole issue is whether Plaintiff only received a copy of the Policy that was missing this provision, and should therefore be exempted from the shorter limitations period.  This issue sounds in equitable tolling, an "extraordinary measure" and one that ought not to apply to "thwart actuarial prediction of plan liability and thereby threaten the ability of [ERISA] plans to prepare in advance to meet financial obligations simultaneously to both beneficiaries and adverse litigants."  *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 322, 325-26 (2d Cir. 2004).  In attempting through equitable tolling to avoid the shorter limitations period, by arguing that LINA did not provide her with a copy of the Policy containing this provision, Plaintiff bears the burden of proof.  *I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc.*, 182 F.3d 51, 54 (1st Cir. 1999; *see also Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 511-12 (2d Cir. 2002) (declining to decide whether equitable tolling applies to time limits specified in a long term disability plan, but observing that generally a plaintiff bears the burden of proving that tolling is appropriate).[22]

---

[22]    Although the Second Circuit has recognized that equitable tolling may be appropriate to excuse the failure to timely file suit where a plaintiff's mental impairments caused the delay in filing, *see Garcia Ramos v. 1199 Health Care Emps. Pension Fund*, 413 F.3d 234, 238-39 (2d Cir. 2005) (collecting cases), here, there is no evidence that Plaintiff's mental impairments prevented her from filing this action within the applicable three-year limitations period.  Plaintiff was receiving psychiatric treatment as of June 2004 (*e.g.*, LINA 85), and, according to treatment records submitted to LINA, she appeared to be stable (*see, e.g.*, LINA 58 ("Fair insight, judgement [sic], & impulse control."), 65 ("Fair insight, judgement [sic], and impulse control during the session.  Oriented x3.")).  In addition, following the denial of her long term disability benefits and subsequent denials of her administrative appeals, Plaintiff was notified of her right to sue under ERISA to challenge the denial of such benefits.  (*See* LINA 51, 79, 109.)  Finally,

Plaintiff, unfortunately, has not met her burden.  At trial, Plaintiff testified that the copy of the Policy from State Farm, *not* LINA, in December 1993, which she submitted to this Court, was the sole copy that she received.  (Pl. Ex. A; Tr. 51, 64.)  Plaintiff also testified that her copy did not contain, nor did she remove, the two-page insert with the provision for the shorter limitations period.  *See supra*.[23]

Even though this Court accepts that the copy of the Policy that Plaintiff received from State Farm did not contain this provision, the administrative record establishes that Plaintiff received *directly* from LINA at least one copy of the Policy containing this provision.  On April 21, 1993, Ms. Bass, one of LINA's claims administrators, wrote to Plaintiff, "We have enclosed a copy of your policy for your perusal[.]"  (LINA 723.)  The copy of the Policy that LINA would have sent Plaintiff in 1993 is the same as the copy in the administrative record (LINA 7-47), which contains the provision for the shorter limitations period.  *See supra*.

Because this Court finds that Plaintiff received LINA's copy of the Policy, it concludes as a legal matter—and not one which this Court takes lightly[24]—that Plaintiff is not entitled to equitable tolling, and this action remains time-barred.  *See Heimeshoff v. Hartford Life & Accident Ins. Co.*, 496 F. App'x 129, 130-31 (2d Cir. 2012) (holding that, because the plaintiff "received a copy of the plan containing the unambiguous limitations provision" from the defendant insurer, she was not entitled to equitable tolling, and her claim had therefore "expired"

---

while less significant, Plaintiff's demeanor and conduct throughout this action, which commenced in 2009, has not revealed any mental impairment that would have prevented her from filing earlier.

[23]   This Court has already found that the evidence adduced at trial was insufficient to show that Plaintiff's copy of the Policy contained this provision.  *See supra* note 18.

[24]   Specifically, this Court recognizes the principle that "statutes of limitation 'are not to be disregarded by courts out of a vague sympathy for particular litigants.'"  *Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan*, 201 F.3d 44, 47 (2d Cir. 1999) (quoting *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984) (per curiam)).

under the shorter limitations period, rather than Connecticut's six-year limitations period); *see also I.V. Servs. of Am., Inc.*, 182 F.3d at 54-56 (refusing to allow the claimant's assignee to equitably toll the shorter limitations period, because it had failed to prove that the claimant did not receive a copy of the plan from the defendant insurer).[25]

### D. Review of LINA's Decision To Deny Plaintiff's Long Term Disability Benefits

Although it does not alter the result in this action, which remains time-barred, this Court articulates its reasoning for concluding that LINA improperly denied Plaintiff's long term disability benefits in December 2003, and that such benefits should have been reinstated after Plaintiff provided proof of her continuing total disability during the administrative appeals in 2004 and 2005.

The administrative record overwhelmingly demonstrates that, since 1991, Plaintiff suffered from chronic mental impairments, including organic brain or mental disorder, bipolar disorder, organic mood disorder, and/or severe depression, and that she was totally and permanently disabled for any occupation. Between March 1991 and September 2003, Plaintiff submitted reports and forms completed by her physicians, mainly psychiatrists, all of whom confirmed that she suffered from certain of these impairments and was therefore disabled. Several physicians also submitted treatment notes at various points throughout this 12-year period.

---

[25]     Although Plaintiff could not recall receiving LINA's copy of the Policy (*E.g.*, Tr. 64), let alone reading or becoming aware of the provision for the shorter limitations period contained therein, this fact alone fails to justify equitable tolling. *See I.V. Servs. of Am., Inc.*, 182 F.3d at 55 (basing rejection of equitable tolling on the fact that "the only reasonable reading of [the claimant's] testimony is that she did not recall whether she ever received a copy of the Plan"); *cf. Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 850 (7th Cir. 2001) ("To say that a claimant who receives the notice [of the limitations period for his Title VII action] but does not read it or ask his attorney to explain it within the 90 days should be exempt from the limitations period under the principle of equitable tolling renders the procedural rule itself meaningless.").

As early as July 1993, Dr. Casson, a neurologist, determined that Plaintiff's impairments were permanent.  Dr. Casson emphasized in his report:

> At this point, more than four years following the injury, these conditions are permanent.  There is no reason to ever expect any improvement in her situation.  The patient is 100% impaired and will remain so permanently.  There is no therapy, medication or any other type of treatment which will enable her to ever return to any type of work whatsoever.

(LINA 704.)  For the next 10 years, every one of Plaintiff's psychiatrists echoed Dr. Casson's determination concerning Plaintiff's continuing total disability.  (LINA 153, 167 (Dr. Pardeshi); LINA 463, 622 (Dr. Saraf); LINA 653 (Dr. Zanger).)

In December 2003, LINA denied Plaintiff's long term disability benefits, because she did not provide the treatment notes in support of Dr. Pardeshi's PFA form, which simply confirmed her continuing total disability.  Considering the well-documented history of Plaintiff's total disability for over 12 years, the denial of such benefits was contrary to the weight of "all documents contained in [Plaintiff's] claim file, viewed as a whole" (LINA 50) and was therefore improper.

LINA also improperly denied Plaintiff's first administrative appeal, after Plaintiff explained that she had been unable to obtain the treatment notes due to Dr. Pardeshi's closure of his practice.  (LINA 101.)   Although the Policy allowed LINA to require that Plaintiff submit updated medical information, LINA had not consistently required physicians' treatment notes during the 12-year period in which it had paid Plaintiff long term disability benefits.  *See supra*. Denying such benefits when Plaintiff was incapable of doing so, after she had already satisfied LINA as to her total disability for more than 12 years, was improper.

Finally, LINA should have reinstated Plaintiff's long term disability benefits, rather than denying her second administrative appeal, after receiving in 2005 medical information regarding her continuing total disability.  Such information, which included Dr. Wang's initial evaluation

in June 2004 and various treatment notes for the period from June 2004 to September 2004, was more than adequate to prove Plaintiff's continuing total disability and to justify reinstatement of her long term disability benefits.   LINA's conclusion that such information did not prove Plaintiff's disability between December 2003 and June 2004 was incorrect.   Dr. Wang's initial evaluation in June 2004 confirmed Plaintiff's longstanding diagnoses for organic brain and mood disorders, and the persistence of her mood symptoms *since* 1989.   (LINA 72-73.)   In July 2004, Dr. Mirasol confirmed that Plaintiff was also "*chronically* depressed."[26]   (LINA 62 (emphasis added).)   Dr. Mirasol found that Plaintiff's impairment was serious enough to warrant the "possibility of ECT [electroconvulsive therapy] trial."   (*Id.*)   The Creedmoor psychiatrists' conclusions plainly related back to mental impairments that Plaintiff had for years before December 2003, and confirmed that these impairments had continued through September 2004. This Court does not believe that these impairments suddenly stopped in December 2003 and started up again in June 2004.   Considering that Plaintiff's mental impairments persisted between December 2003 and June 2004, there was ample basis to conclude that Plaintiff remained totally disabled during this six-month period, just as she had been for over 12 years prior.   Thus, based on the medical information that LINA received in support of Plaintiff's second administrative appeal, her long term disability benefits should have been reinstated.

Accordingly, absent the fact that this action is time-barred, this Court would have awarded Plaintiff the $25,243.29 in long term disability benefits to which she was entitled between December 21, 2003, the date after which such benefits were denied, and August 31, 2006, the last day that she qualified for such benefits based on the Policy's 65-year age limit.

---

[26]   "Chronic" is defined as "something that continues over an extended period of time.   A chronic condition is usually long-lasting and does not easily or quickly go away."   PubMed Health, *Chronic* (2013), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002966.

But justice requires balancing the plaintiff's interest in bringing her meritorious claims before this Court with the defendant's interest in the certainty of knowing how long it should expect to defend against such claims. *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 463-64 (1975) ("[T]he length of the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones."). This Court's "vague sympathy" for the plaintiff should not upset this balance. *Carey*, 201 F.3d at 47 (quotations omitted). Here, in spite of its recognition that Plaintiff should have continued to receive long term disability benefits from LINA, this Court must preserve this balance, by finding that this action, though meritorious, is time-barred.

III. Conclusion

Accordingly, this Court DISMISSES with prejudice Plaintiff's action on statute of limitations grounds. The Clerk of the Court is directed to enter judgment in LINA's favor and terminate this action.

SO ORDERED:

 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: August 16, 2013
       Brooklyn, New York